Please rise. This court is now in session. Please be seated. Clerk, will you call the next case, please? 315-0859, Armstrong, Washington Industries, being appelled by Jeffrey Sorensen v. Mark Frechette, Treasurer and Ex-Officer, County Collector of Kankakee County, employed by Teresa Cooperman. Thank you very much, Devin, and I apologize already, Mr. Sorensen. May it please the Court and Counsel, my name is Jeff Sorensen. I am the attorney for the petitioner and the appellant in this matter, Armstrong World Industries. We are here today because the trial court refused to issue a writ of mandamus compelling the Kankakee County Collector to pay a property tax refund to Armstrong from the next funds collected after the entry of the final judgments of the Property Tax Appeal Board. The issue in this case is really, I think, a simple one. It's one of statutory construction, the facts are not in dispute, the matter below is decided on cross motions for summary judgment. But it's also an issue of whether the fact that Armstrong's property, to which it was entitled to a refund, was located within a tax increment financing district, otherwise has an effect on what would otherwise be a clear and undisputed right of Armstrong to payment of its refund under Section 2320 of the Property Tax Code from the next property taxes collected. Okay, let's talk about that. From the next property taxes collected in the county or city or what? The next property taxes collected on behalf of the taxing district, in this case it's the city of Kankakee. Right, okay, so from whatever source? Whatever source that is collected for the city of Kankakee, regardless of whether it comes from the TIF district or otherwise. Okay, so to simplify it for my simple mind here, there are districts within the city or special taxing districts within the city that the county collector collects for? The county collector collects, Your Honor, on behalf of the city or the various taxing districts. The TIF district is not a taxing district. Correct. So it collects on behalf of the various taxing districts, it could be the city, it could be the schools, there are obviously many libraries, library districts, numerous taxing districts on whose behalf it collects. So are you saying it should take funds that it collects on behalf of those districts and use that for the repayment? No, we're saying it should take taxes it collects on behalf of the city of Kankakee and pay the refund from those funds. So the city of Kankakee would be like general revenue? That's right. Okay, so the city of Kankakee's general revenue pays for what, please? What do they use the general revenue for, the city of Kankakee? They would use the general revenue for all obligations of the city to maintain the municipality. Roads? In the city, yes. Cleaning the windows at City Hall, police, fire? Yes. Unless there's a separate taxing district. So you want that repayment paid from the general revenue? We want it, yes, Your Honor, we do. And so the suggestion was that you're going to instead get back the property taxes that are leveraged in the TIF district. The TIF district, okay, has collections, correct? It's only one business there, Armstrong. Right. So Armstrong pays taxes. It pays taxes. Well, it pays taxes based on the assessed value of the property. And a certain percentage of that is segregated and put into a TIF fund, but it's not a separate taxing district. It's still the city's money. Correct. So you're suggesting that portion that goes into a TIF fund, you should draw out of that as well? Yes, we should. Because it's not a separate district. That's right. And also, anything else that Armstrong pays in the general revenue, that money should go back to Armstrong, too, until the $700,000? It was $728,000. It comes back to it. That's right. And there have been partial payments, but there's still an amount owed. And our position is that any general tax revenue, the next funds collected for the city, for the taxing district, should be used to pay the refund. And the fact that the property is located in a TIF district doesn't make any difference to the taxpayer's right to the refund or how the refund is to be paid. And as we point out in our brief, Your Honor, there are circumstances in which if you limit the refund to taxes that are paid and segregated into the TIF fund, then there's a potential that the tax refund will never get paid to Armstrong or to a hypothetical taxpayer in Kankakee County, whose property is located within the TIF district. Because you could have a circumstance where, under the trial court's decision, if the right to payment of the refund is limited to TIF funds and the TIF district expires before the refund is paid in full, then you have basically the taxpayer in limbo, where the taxpayer has no ability to recover the refund that it would otherwise be entitled to if it's limited to payment of monies that are segregated into the TIF fund. But those, again, are ultimately the property of the taxing district, the city. So our position on how this is... How much Armstrong Industries, how much did they pay? What's their total tax bill? Your Honor, I believe, for the years in question, it was approximately $300,000, and the tax bill was cut roughly in half. I apologize, it's in the brief, I don't have the specific number. But roughly, the tax assessment was cut in half by the property tax appeal court. The assessment? The assessment. Okay. So I believe the numbers are roughly $150,000 a year. Is what Armstrong writes the check out for, for property tax? It had written the check out for $300,000, and then the PTAT determined that it was entitled for 2007 through 2010 to roughly $150,000. So roughing it out, in five years' time, if Armstrong doesn't write another check for property taxes, they've got their $750,000. Well, they don't write a check. They don't write a check, but the trial court didn't say we could set off all of our property, the refund against all of our property tax obligations. The trial court said we're not entitled to the refund because there was not clear guidance on where the funds to be paid would come from. So we don't think that is consistent with the Illinois statutory scheme, the property tax code. We think that the 20 through 20 is clear that the property taxes are to be paid from the next funds collected. And the TIF district- Does it say the next funds collected by the collector from whatever source? It says, shall be made, and I'm paraphrasing slightly, but refund shall be made from the next funds collected after entry of final order. And I have it in the record, obviously. But that's in the context of the statute, right? Yes. What's that statute deal with? I mean, what section is that? That's section 2320 of the property tax code. It is 35 ILCS 200-23-20, and it deals with the rights of a taxpayer who protests their property taxes to receive payment of the refund. Well, yeah, because that's my question. Because isn't it in the section where there's a protest fund and there's no longer a protest fund? There's no longer a protest fund, so the payment has to be paid. The monies aren't segregated anymore because they're not paid under protest. So the statutory scheme now is that if you prevail on a property tax appeal before the PTAB, the Property Tax Appeal Board, then you are entitled to payment from the funds that are in the possession of the tax collector or the next funds collected. And if the statute does not provide clear and unambiguous guidance. So my question is, as I look at this very simply, it says you exhaust the protest fund when we have one, right? We don't have that. We don't have that anymore. That's right. Well, I'm just wondering if that section doesn't just refer to the protest fund which doesn't exist anymore. Your Honor, I don't believe it does. I don't believe the legislature intended to provide for a statute and the statute for a mechanism that no longer exists. This is, respectfully, I would assert that this clearly and unambiguously provides for the tax collector to take the monies and pay them to the taxpayer who is overpaid. And it is undisputed that Armstrong overpaid taxes, was assessed unfairly and excessively. And as a result, the Property Tax Appeal Board revised the assessments, reduced the amount of property tax. And this court affirmed one of the PCAP's decisions as we cited in our brief. Well, that's not under review here. No, it's not. So that's irrelevant. We're talking mandamus. Understood, Your Honor. But the fact that we have an undisputed right to a refund is certainly not in dispute either. And the only issue is where do the funds come from to pay the refund? And if 2320 doesn't provide clear and unambiguous guidance, then will you ever have a property owner who has paid taxes and prevailed in a PCAP who can compel a municipality or a county collector to pay a refund? If you don't say that 2320 provides clear and unambiguous guidance, then no property tax protester who prevails in a PCAP is ever going to be able to compel a county collector to pay what they are due. And I don't believe that that's the public policy of the state of Illinois. And again, there has been a determination by the PCAP that Armstrong has overpaid its taxes and is entitled to a refund. And 2320 provides clear and unambiguous guidance. And for that reason, we would ask that the court reverse the trial court's determination. General Webner may mean a little Christmas tree in the square, right? It very well may mean that, Your Honor. It's not the shopping pool that opens if it's not part of a district. Well, that could be a part of a district, separate taxing district. But it's not Armstrong's obligation to bear that burden that has resulted from the over-assessment of its property. There has to be a refund, and it creates some short-term financial crisis. Crisis is a strong word. It creates an issue. Whether it's a crisis or not isn't in the record. It's an issue for any municipality that is directed to pay a refund of property taxes pursuant to 2320. But there is a clear and straightforward public policy set forth in 2320 that the taxpayer who is overpaid is entitled to a prompt refund. So, again, we think 2320 is drafted as it is in order to make it clear that absolutely the refund is to be paid from any general revenues received by the taxing district. In this case, the city of Kansas City. This is not in the briefs of the record. So the legislature got rid of the protest fund? Yes. Why is it public policy? Well, that's the legislature's determination. It is the public policy of the state of Illinois, and the legislature's decision that that is the appropriate public policy is entitled to deference. Thank you. Mr. Sorensen, I have a question. Yes. You have said that the TIF is not a separate taxing district. Correct. But there is money that goes into the TIF based on a formula that comes out of the money that is taxed by the city. Is that correct? It doesn't go into the TIF. There is money that is collected based on the incremental increase in assessed value that is segregated and then ultimately paid to the municipality. But it's the municipality's property. But it's designated as TIF money. It is designated as TIF money. That's correct. Now, are there restrictions? That's one of the controversies about how TIF money can be spent by the municipality. There certainly are restrictions on how TIF money can be spent. So you can't put up the Christmas tree and stream the lights with it? Probably not. Okay. But it has to be used for economic development, arguably. That's right. We didn't brief the TIF Act in detail, but generally the TIF Act provides for ways to improve blighted conditions in municipalities and creating special TIF tax incremental financing districts to pay for improvements in that district. Which the legislature has in the last session tried to tighten that up. I believe that's correct. It's been a cowboy fund. So if the county collector, when he gets all of the tax money, decides that there isn't enough money to pay a refund, he can't take money from the county assessment or the county income and pay it out for something else? He can pay, the county collector can pay Armstrong's refund from any, put aside the TIF funds. The county collector can pay the refund from any tax revenue collected on behalf of the city of Kankakee. So if you have this incremental payment of $150,000 that has been segregated in a TIF fund, but you have millions of dollars in other tax revenue that the city collects, the county collector is not limited to paying back Armstrong and paying the refund from the TIF funds. It can pay from the millions that it has collected pursuant to the general taxing powers and the general tax revenue of the city. And that's your argument, but the tax collector obviously feels differently about that. Absolutely. That's the issue before the court. That's the real issue before the court. Well, obviously, type value of money, you want it quickly and they want to double it up. Well, and as we point out in our brief, there is also the possibility that if the assessed value of the property, I mentioned the hypothetical of a TIF district expiring, there's also the hypothetical of there's a significant change in economic conditions and property tax assessed values decline and there's no incremental tax revenue, then the way that matters have been proceeding, if there's no money paid in to the TIF fund by Armstrong going forward, then there's no money available, according to the county collector, to pay Armstrong back. So Armstrong is constantly in this spiral where it's paying monies and then protesting. And so far it has received, it has prevailed in the PTAB proceedings and refunds have been ordered, but it only gets paid when it pays the next round of taxes, which it has to appeal. At some point, the TIF district is going to expire. And unless the court intervenes, that is going to potentially put Armstrong at risk of never receiving its property tax refund. Well, you know, clearly you have statutory, this would have been a wonderful mediation resolution, just say don't write out a check for five years. I mean, you may not be happy with it, but it would have ensured that you would have gotten your refund back. Well, the taxes were paid and the refund is still unsatisfied, so we brought the mandamus action and again, I respectfully urge the court to determine that there is a clear and unambiguous statement of where the funds are to come from, set forth in the property tax code. There have been some partial refunds and those have come from payments of, for example, and this is somewhat outside the record, let me share this with the court. Armstrong just got a check for the refund, but it was based on the fact that it had paid its 2015 property tax assessment in June of 2016, whenever it was due. Which is a roundabout way of just giving their money back. But again, at some point, if those assessments are excessive and Armstrong has to continue to appeal those and it prevails, then at some point it's not really being refunded. Because they're paying a full amount. They're paying a full amount currently. The $300,000, that's the number we're using for purposes of this discussion. They're paying the full amount. Post PTAB decision, you're still paying $300,000? Yeah, the property continues to be assessed at what I would call the higher levels that it was assessed at prior to the PTAB proceedings. So that creates the tax increment financing funds that the collector has been turning around and paying back to Armstrong. But ultimately, we're only paying ourselves. We're not really ever being made whole. And if the TIF district expires, which it will eventually, and that situation continues up until the end of that term, then under the trial court's ruling, we may never, Armstrong would never get paid its property tax refund. Because ultimately, you come to the end of the TIF district, let's say Armstrong prevails on a PTAB proceeding, and the assessed value of the property is moved from $3 million to $1.5 million. And the $3 million, the incremental tax has been paid into the TIF, but once that money is not being paid into a TIF fund, then Armstrong is not going to have repayment. Thank you. If you're still paying at the inflated assessment rate, are you generating still more refunds? Yes. So Armstrong continues to appeal the assessments at what we would call, our position obviously, the inflated assessed values. You appealed how many years back? I think the first appeal was 2006, then that was paid in full. Then 2007 through 2010 were all decided, I think, fairly closely. And those are the ones that are at issue in the mandamus pleading. There have been certain payments, but again, the payment comes from the payment of property tax by Armstrong based on the higher assessed, equalized assessed value. But even though you're paying yourself the originally incurred overpayment, you're still generating more overpayment because you're still having to pay tax at the higher rate. Right. It's almost like a pejorative term, but it's almost like a Ponzi scheme. It's almost like a Ponzi scheme. So for those reasons, we would ask that the court vacate summary judgment and direct the trial court to enter summary judgment for Armstrong. Thank you. And Ms. Kubelansi, have I got that right? Ms. Kubelansi. May it please the Court, good morning, Justices and good morning, Counsel. My name is Teresa Kubelansi. I'm an Assistant State's Attorney with Kankakee County. I'm here representing our Treasurer, Ex Officio County Collector. On behalf of the Treasurer, I respectfully request this Court affirm the trial court's decision. In this case, the trial court granted the Treasurer's motion for summary judgment and held that the plaintiff failed to establish that it is entitled to a mandamus order. In doing so, the Court correctly found that the plaintiff failed to show a clear authority on the part of the public official to act in the manner in which the plaintiff demands. In this case, as we've just heard from Counsel, Armstrong's position is that the Treasurer has authority to reach into the general fund of Kankakee City to pay the remainder of the refund that is due from the tip. Why is that not clear in Section 2320? Why is it not clear? Yeah, because that's the whole argument, isn't it? That is what the Court found. So 2320 states that the Treasurer pays the refund from the next funds collected until a full payment is made. And then it also has this interest provision. The Treasurer's reading of it is in light of the entire statutory scheme. So if I can, I'm going to answer your question, but I'm going to just take it back a step. The Treasurer's authority is from statute. And his authority to collect taxes kind of originates from the clerk. So in the tax cycle, after the assessments are made, which is neither the clerk nor the Treasurer, the clerk extends the rates. And the TIF Act and the Property Tax Code require the clerk to list the TIF extensions separately and to list that money that goes into the TIF separately. So once the extensions are made, the clerk signs what's called the collector's warrant and attaches that to the collector's books, and then that goes to the Treasurer. And then the Treasurer is then authorized to collect taxes and disperse them. So his authority really comes from the collector's warrant, which lists the TIF funds separately. So you're saying the TIF fund should be looked upon like the library district or the school district. Yes, so 2320 in the Treasurer's mind really isn't that unclear. But the court did find that it didn't – I think 2320 is unclear in respect to it doesn't say what Armstrong would like it to say. I think Armstrong wants it to say, you know, when you're paying a refund, there is symmetry. There is symmetry where the overpayments were made and where you're going to make the refund. But if, you know, the TIF is out of the money, then the Treasurer should have authority to go to the City of Kankakee because the City of Kankakee is the municipality that created the TIF, and they're the ones that operate the TIF funds. But 2320 doesn't say that. It just simply doesn't go that far. And I think that makes sense, and I think that's, you know, in line with the rest of the property tax code. So if you're reading that 2320 is, again, bad policy in my view, but they got rid of the protest fund. Because this overpayment, part of that overpayment was through warrant to go to a TIF fund, that section that I was looking at from the next funds collected can only mean next funds collected from that TIF fund. Correct. And I think that also makes sense because if you read the TIF Act, it states that those funds have to be held separately by the City Treasurer, and they can only be used for redevelopment funds. So if the plaintiff prevailed and the Treasurer were forced to take the City of Kankakee general funds to kind of satisfy this TIF debt, next year when the TIF collects $200,000, the Treasurer can't go and take that $200,000 that the TIF should have paid and give it back to the City for its Christmas tree and its police pursuit fund. Was all of this overpayment found by PTAP overpayment of only TIF money? No, it's just that all the other money was already paid back. So if I can try to explain it clearly, they were assessed at a certain amount, and there's already a baseline. When the TIF was created, a baseline assessment is created. Everything below that baseline is taxed ordinarily. Your library district gets 2% or whatever the amounts are. And then the incremental increases, they take the same tax rate, apply it to the increase, but that all goes to redevelopment funds and the TIF funds. So the library and the schools don't get the benefit of that? There was only of the $700,000, only $80,000 was owed by those districts, and they were able to pay it back immediately. The rest is just TIF money, if that answers your question. So they did take money from the special districts to pay back? Yes, it was just paid back, so it's not really a subject here. It was able to be paid back. Well, that's interesting, because that's kind of your argument. I mean, where did their funds come back? Those monies were in that district, right? They were taken out of the TIF. The decisions, time-wise, came when the treasurer was still collecting money. So in October, I think it was, of 2014, when the decisions came in, he was still collecting money from the regular tax cycle. So these smaller amounts were able to be paid pretty much on demand. So in other words, if I wanted to simplify this, City of Kankakee doesn't want to take the hit, but the library districts and the school districts did take the hit? No, I maybe didn't explain it correctly. No, the City of Kankakee also paid a portion of the refund. A portion? Yes, it's just that those corresponded to what their overpayments were, because of where the baseline and where the decisions came in. So had the decision come in above the baseline, then none of the taxing districts would have paid anything, because above the baseline is just TIF money. So the decision came in just below the baseline, so there was a little bit that was just taxed ordinarily. So those did result kind of just in an ordinary tax refund. I have another question. If the monies in the TIF are limited to development, can they even pay the refund out of the TIF money? They can, yes. Why? Because the idea is that in 2007 through 2010, too much money was paid into the TIF. So based on the new assessments, which were lower, it's just treated as an overpayment that gets refunded. So the TIF received too much money and was allotted too much money for redevelopment, so now we have to correct that balance years later. But also the characterization of the monies that Armstrong wants is a refund, and it's not an expenditure. TIF is restricted on expenditures. Yes. Conceptually, that's a difference. Yes, yes, you're correct. So the treasurer's position is basically he's never refused. He's never refused to pay the refund they've been paying. He's been paying it about $200,000 per year. So eventually it will get paid. But the more and more is that Armstrong's paying. I'm sorry? And the reason that they're getting back is out of monies that Armstrong's paying. Correct. And that's kind of just out of the particular situation that Armstrong's the only property within the TIF. And that's a redevelopment agreement that they entered into. So they get the benefit of being the only property to receive redevelopment funds, but now they're also facing this consequence that because they're due a refund, they're the only property paying into it. So if, for example, there were 10 other properties in the TIF fund, we would have paid the refund. There would be no argument as to whether the City of Kankakee funds could be used because there would be 10 other properties who would be paying their taxes and ample money would have been in the TIF fund when the refunds became due. Why are they still paying at the higher rate? Pardon? Why are they still paying at the higher rate? Part of it is because of the delayed schedule with the Property Tax Appeal Board. We didn't get the 2006 decision, I think, until 2012, if I'm remembering that correct. The decisions for 2007 through 2010 didn't come until 2014. So in the meantime, they've continued to assess the property because there were no PTAB decisions saying that it was too high. And in the meantime, new evidence has been acquired, new arguments have been made as to justify the new assessment, and I'm not sure if new development has occurred since that time. Takes that long in Kankakee for a PTAB hearing and decision? I think throughout the state it does. Pardon? I think throughout the state it's backlogged like that, not just in Kankakee County. So that's part of the problem. But the county can't decide on its own that we are continuing to generate these overpayments? The Board of Review does have authority to lower the assessment. I mean, the assessment originates in Kankakee Township from the Township Assessor, and then Armstrong appeals it to the Board of Review, and the Board of Review, usually then the City of Kankakee intervenes, maybe with the school district, to say, no, no, no, it should be higher. Appraisals are presented at the Board of Review, and then the Board of Review can make its initial determination, and then that is what gets appealed to the Property Tax Appeal Board. Seems grossly inefficient. And not to put too fine a point on it, stupid. I don't disagree with Your Honor. But that's the situation that we're in. What do you think about the elimination of the protest fund? You know, I've read a lot of the legislative history, and it just seems like the legislature, so the county was required to kind of withhold a bunch of funds in limbo, and I'm not sure if it was just that they didn't think that was an efficient use of money, but I think the discussion was kind of like, we need to get the taxing districts their money as soon as possible, because that relates to their operations, and then we'll give taxpayers interest if they ultimately succeed. And Armstrong is getting interest? Oh, yes, yes. Interest accrues actually from the date of the original tax payment until it's paid in full. So we go all the way back to 2007, and it continues to accrue until we pay the entire refund. And have you resolved 2015 taxes? No, there's currently settlement discussions, but there are pending cases before the Property Tax Appeal Board. For what years? Pardon? Which years are now? For, I think, every year through 2015, if I'm not mistaken. I believe that's correct. They have different counsel for property tax appeals than they have, but yes, I believe every year it's been appealed. So there is no law on this issue at this point? The closest thing any of us found, including the trial court, was the case Perkins v. Quinn, which was an estate tax to the state treasurer where the appropriations for that year to make estate tax refunds was exhausted, and the treasurer and the comptroller said, hey, we know that they're owed that refund, we know we have to pay it, but we just can't pay it right now. And the court ended up denying the writ and saying that the funds were exhausted and there's just no basis for the writ. But our question isn't that the funds are exhausted. I mean, the city of Kankakee has funds. It's a question of... Of whether there's authority to dip into those funds. Right. I think is the real question, and I don't... I think when you look back at the warrant, there is no authority. When you look back at the TIF provisions that require that money to be held separately, there is no authority. And when you consider the fact that the treasurer can't correct the imbalance, so if the city of Kankakee, in its essence, fronted the remaining $200,000 that's owed or $300,000 that's owed, there's no way in the next couple of years to correct that because the TIF will continue to collect money that it now doesn't have to pay back because the city paid it instead. Almost two minutes. Thank you. If that makes sense. I don't know if I'm... Well... The imbalance never gets corrected, is what I'm trying to say. And I think, just in general terms, either there's authority for the treasurer to use city of Kankakee funds or there's not. And that authority would extend to any situation. So even if there were ample TIF funds to pay the refund and the court were to issue a writ of mandamus, that would mean that the treasurer could go touch city of Kankakee funds even when there were funds available in the TIF fund because, in essence, we're saying, well, they're all taxing district's funds, they're all Kankakee city's funds. And I think that's an incorrect result and I don't think that's what the legislature intended. At the end of the day, the plaintiff is receiving its refunds with proper interest, just as the legislature has written. It's just receiving it at a slower pace than it would like. So, in that section, since we no longer have a protest fund, from the next funds collected means from the next funds collected from the TIF that are segregated into the TIF, right? Yes. I think there has to be that symmetry between where the overpayment was made and where the treasurer has authority to make the refund. And while I haven't looked at it, I mean, it's not to say that in a TIF, like, they enter into redevelopment agreements as well, so I don't know if there's a remedy available under the redevelopment agreement with respect to TIFs and refunds. It's just not something that I... How long does this TIF district have left its active life? I don't know that offhand. The other part of your argument is that although Armstrong is getting paid on a slower basis than it would like, it will get paid, maybe, as long as the TIF district continues. Correct. Do you have any idea what will happen to that responsibility for the overpayment if the TIF district expires? Does it then become the obligation of the city? I think possibly under the redevelopment agreements, if there's some basis in contract law, it could. I don't think that under Section 2320 that any additional authority is given to the treasurer when a TIF becomes defunct. I've researched it. There's just no contingencies in 2320 that would say, pay from the TIF until this happens. So I'm not sure if that's just a different cause of action against the city of Kankakee. I'm really just researching what authority the treasurer has, and I don't believe the treasurer has authority to dip into any other funds based upon the collector's warrant and his statutory authority. Let me ask you just one other thing. If we were to decide that this case should be reversed and the rich should be granted, what happens? What are the potential ramifications to the collector if the money is paid out from the city? I think the city of Kankakee has a cause of action against the treasurer because he has statutory obligations to collect their general levy and disperse it to them. And there's specific statutes that I cited in my brief where the city of Kankakee then has a cause of action against the collector. So I think we are back in litigation, but Armstrong will have their money. Thank you. It's been an honor to appear before you. It's a pleasure to hear from you. Thank you. I don't have a lot of comments. I would point out that Ms. Kubalanza made the assertion that the TIF fund is like a taxing district. It's not. It doesn't have any authority to assess taxes on any citizen of the county or city or municipality where the TIF district is located. The fact that the word district is used, it's different than a taxing district. The fact that it's a TIF district doesn't make it a taxing district. Ms. Kubalanza also talked about the redevelopment agreement. That's an agreement between Armstrong and the city. That's not before the court. It's outside the record. And ultimately, what I believe this case is about from the collector's point of view, it's an accounting issue. The TIF fund is an accounting fund. It's set aside. The city has, by creating the TIF district, it has certain uses it can put the monies to, but that doesn't mean that Armstrong should have to pay more than its fair share of taxes based upon the assessed value of the property is determined by the Property Tax Appeal Board, and in one instance is affirmed by this court. But that's not before us. No, no. What's before the court is the obligation under 2320 of the collector to pay the refund from the next funds collected. And what does next funds collected mean? And our position, Your Honor, is that it clearly and unambiguously means any funds. If there were no TIF district here. Yes, well, I don't know that you have to add on to the sentence. I don't think the legislature left something out of 2320. I think it's clear and unambiguous what was intended. There would be no dispute if there's no TIF district in this case, that the next funds collected for the city would be due and owing to Armstrong, even if it created some sort of budgetary issue for the city. The fact that a TIF district was, in fact, adopted doesn't change the result, and it doesn't change Armstrong's right to prompt payment under 2320 of its refund. Does the statute authorize the collector to pay out of the county fund or the library fund? No. I think there has to be symmetry. I think there has to be symmetry. I don't think the, as Ms. Koblanza said, if the assessed value did go below the original assessed value that was established when the TIF district was adopted, and as a result, some of the overpayments went to other tax interest districts, and they've all repaid. It's the city who hasn't repaid all the monies that they received. So we're simply asking for payment from tax revenues the collector would otherwise pay to the city of Kankakee. But all 2320 says is out of the next taxing levy. It doesn't limit it to the city of Kankakee or the county of Kankakee? I mean, if we're just going to go by the simple language. The 2320 does address situations where tax refunds are owed, and if Armstrong is overpaid, let's say $100,000, and that money is distributed by the collector to various taxing districts, it's apparent who has received the money and who hasn't received the money. And certainly an entity that didn't receive the revenue from the overpayment should not be making the refund payment or bear the burden of the refund payment, but here the city of Kankakee has not returned money because it believes, the collector believes, that the money can only come from funds that are in the TIF fund, and again, we would assert that that is not the correct answer. And for that reason, we would ask the court to reverse summary judgment for the collector and direct that summary judgment be entered for Armstrong. If the court has no further questions, thank you for your time this morning. Thank you very much, Lawrence, and thank you both for being here today. Very interesting discussion in my area, but I think we'll leave it at that. So, we're going to take this matter under a five-minute tip edge with a written disposition to finish. We're now going to take a luncheon recess. We'll be back at 1.15. Please rise. This court stands recessed.